Good morning, Your Honor. Good morning, Captain. May it please the Court, my name is Howard Junior. I'm counsel for the appellant, Maria Fernandez. We are appealing from the grant of summary judgment, the United States District Court for the Northern District of California, in which the judge granted summary judgment on Ms. Fernandez's claim for disability discrimination. And in granting the motion for summary judgment, the district judges threw out all of the evidence that Ms. Fernandez offered, ruling that some of it was not based upon her personal knowledge, that other evidence was improperly authenticated, was not properly authenticated. And all of that evidence bore on the question of whether or not Ms. Fernandez's case should have proceeded to trial. Well, the stuff that was thrown out doesn't seem to me to really bear on the district court's reasoning at all. It kind of was frosting on the cupcake, as it were. Well. But what I – it seems to me that the district court did, and my concern is, which is what I want to – I'd like for you to explain why you don't see it this way. The key paragraph in Ms. Fernandez's declaration is one that wasn't stricken, and that is that due to pain and discomfort that she was experiencing, her life was turned upside down. She couldn't brush her hair, she couldn't put on shoes, dress herself or take care of the needs of her family, she couldn't cook, and she became dependent overnight. Now, that to me is the key paragraph. Here's the problem I've got with it, and that is that it's totally untethered as to when that happened. And in order for that paragraph to create a triable issue of fact, it seems to me it has to – those conditions had to have existed during the relevant period of her employment. And during the relevant period of her employment, her doctor's restrictions did not preclude her from working altogether. It was a light load, whatever, but she wasn't totally disabled at that time. So that's – I'm sorry to be long-winded, but I had to get it all out because to me that's the heart of the case, and I wanted to hear from you on it. Sure. I'd be very happy to address that. Ms. Fernandez became disabled on the 1st and 2nd of February of 1999. Well, she had limitations. She didn't have permanent disability for another two years. She became disabled at that time with respect to a major life function, that of caring for herself. Well, but see, that's the whole thing, Mr. Moore, I'm trying to focus you on, because I don't see anywhere in the record where that evidence is. Where? I just read you the paragraph, and the paragraph is untethered to time. It doesn't say it was during the period from February to the end of March. It just is this paragraph in the air. She testified, her testimony was, that her life was turned upside down. Well, I understand, Mr. Moore. And that condition persisted, and it persisted. But it doesn't – okay. It persists until this day. I'm going to ask it only one more time, because to me this is critical. The paragraph that says her life was turned upside down doesn't say when. Well, there are other paragraphs. With the doctor's limitations, she saw her physician, and the doctor put restrictions on her workload, but did not say she was disabled during the relevant time period. Well, the doctor didn't say that, and it wasn't necessary for her, in order for her to qualify as a disabled person, for the doctor to say that. What she did, she went to her doctor to get a verification to take to her employer. And the doctor at Kaiser put in the materials, the information, that he thought would be essential for the employer. And with respect to the employer, the only information that the doctor felt that was important for the employer was that Ms. Fernandez sustained carpal tunnel syndrome, and that was his diagnosis. And that she, with respect to performing repetitive hand motions, this was up to four hours a day, a combination of writing and typing. That was ‑‑ had lessened the restrictions to two hours of keyboarding and four hours of writing a day, and that was the diagnosis that continued through April 28th when she was terminated. Well, I'd like to point the Court to something else. The first ‑‑ first Kaiser visitation is found at ER 230. Yes. Okay. That's when she went in, in February 11th or 12th at that time. Yes. The doctor at that time restricted her to four hours a day, a combination of writing and typing. Yes. Okay. She then went to the doctor again on March 3rd, 1999. That's found at ER 178. And he placed her on work restrictions at that time from March the 3rd to March the 23rd. I thought I just recited all those. Well, you gave it a twist that I didn't see. No, I haven't given them a twist at all. I'm just saying what the limitations were. They were very severe on March 3rd, requiring no keyboard work and only two hours of writing per day. By March 24th, the restrictions were two hours keyboarding and four hours of writing. That is, there was an improvement and a lightening of the restrictions, and that was the continued diagnosis until April 28th. That was the information that the doctor provided. Yes. But there was other information pertaining to her illness. She was seen wearing the braces. Sure. I look at it. Nobody's questioning, balling the fact that it was painful and it was disruptive. And she had discussions with her supervisor, Ms. Bardini, about the condition. And Ms. Bardini shared her experience with her about the condition. Ms. Bardini recognized that it takes ñ it may take considerable time for the condition to ameliorate or improve or stabilize. So we have that evidence in the record with respect to the condition. But she had interference in a major ñ Her life was turned upside down and she became a dependent overnight. She's asking if there's evidence in this affidavit or there's evidence elsewhere or a statement in the affidavit that tells you when that occurred. It occurred, Your Honor, on February 1st and 2nd of 1999. How do you know that? There is other evidence in the record with respect to her deposition testimony. Well, that would help. What is the other evidence in her deposition that says when that occurred? I can get the page when I sit down, Your Honor, and come back to my rebuttal, and I'll point you to that page. That would be helpful. That position, that condition persisted, and it persisted tonight. Let me ask you to support ñ If you can tell us from when you sit down when that started, this dislocation of her personal life, where it says it was turned upside down, if you have in the deposition the date when she says that occurred, that would answer Judge Rimer's question, I would think. Mr. Moore, the question I have is even assuming you get over that problem, I'm having a hard time seeing where the district judge was wrong in holding that there was ñ that she was not otherwise qualified. She was having a backlog problem even before this all began. She had a backlog problem. When did the backlog problem become a problem? Well, at least at the end of January, they were ñ Let me ñ I spent a lot of time on this case. The backlog became a problem. When the first evidence that there was a backlog problem came on February the 9th, when her immediate supervisor, Mr. Johnston, called her in to send her an e-mail telling her that he wanted to see her and discuss resolving the backlog problem. At that time, she was already under work conditions and was suffering from a disability. Okay. My notes were that she had a 29 or 30 case backlog as late as the end of January. So she had a backlog. That's not the question whether she had a backlog or not. Well, it is to them.  You can assume that she had a backlog. You don't have to doubt if she had a backlog. She had a backlog. But the question is whether or not her disability permitted her to resolve the backlog. And the other ñ Why is that the question? She was having a problem getting her work done before she had the medical problem. There is little evidence that she had a problem getting her work done before that. The judge struck from the record, I believe Exhibit 9, to Ms. Fernandez's declaration. And Exhibit 9 were reviews that her supervisor conducted every week. And in none of those reviews, over a five-year period of time, is there any question about the backlog being a problem? Over what period of time? Five months. Five months. Okay. There was no evidence that the backlog was a problem. The first time there was any evidence concerned about the backlog being a problem is in the e-mail that Mr. Johnson wrote to Ms. Fernandez on February the 9th of 1999, after she had the disability and the work restrictions. No. She didn't see the doctor. She didn't see the doctor, but she reported the work restrictions. She reported her inability to perform the work, at least on the third. So there were no work restrictions. I mean, you know, just to be technical about it. Well, to be technical. But she had this condition, the swelling in the hands and the swelling in the neck and all of that stuff, and she couldn't do the work at that time. So she never really had a problem. The other question, the other issue that was of concern in the case was with respect to the backlog. Some of the backlog was attributable to circumstances over which she had no control. They may have been mistaken about the cause of it, but that's not discrimination. That's just being dumb. Well, the question is, if there was a backlog of circumstances over which she had no control, then can you fairly say that she was not otherwise qualified to do the work? It goes to the issue of whether she's otherwise qualified. If there are circumstances over which she had no control, which creates a backlog, that's what it goes to. I wanted to ask you something else, too, that concerned me about the record. I've got the doctor's report. I think it's the February 12, 1999 report, and the doctor checks a box that says, the above-named person does not have a serious health condition. This is ER, looks like 170 in the record, February 12. The doctor says she does not have a serious health condition. Well, to be honest, the person with a disability doesn't determine on the doctor's diagnosis, but it rather determines on the employee's experience as a part of that experience as to the condition. And in that point, the doctor's diagnosis, the doctor's opinion, was correct. I'll leave the rest of my time to the doctor. Thank you. Good morning, Your Honors. May it please the Court. Julie Arbuckle on behalf of Michael Chertoff, Secretary for the Department of Homeland Security. On this appeal, the plaintiff, Ms. Fernandez, is requesting this Court to overturn the district court's well-reasoned order granting summary judgment in favor of the defendant on several alternative grounds. In order to obtain a reversal of the district court's decision, Ms. Fernandez must establish that each and every one of those alternative grounds is erroneous. With respect to the, and Ms. Fernandez is alleging both the disparate treatment disability discrimination as well as failure to reasonably accommodate discrimination. With respect to both of those types of discrimination, Ms. Fernandez is required to establish that she was disabled, meaning substantially limited in a major life activity. The Court is correct in raising questions concerning the conclusory statement in Ms. Fernandez's declaration regarding caring for herself, because that is the only major life activity that she's contending on this appeal that she was substantially limited in. Why isn't that good enough? Why isn't her declaration that she can't do these things enough to get by summary judgment? Well, there is no statement as to when. Okay. But in paragraph 12, paragraph 12 talks about what happened on Monday, January 1. And then paragraph 13 is the paragraph that Judge Reimer read that doesn't have a date. But then paragraph 14, the next one, starts February 2. I mean, reading this, and then paragraph 15 is February 9, it purports to be a chronology of what happened. That I don't think is clear from the declaration, and there's no evidence in the record as to when. Well, if we could read it that way, that she's going, you know, 1st, January 25th, this thing happened. Then February 1st, another thing happened. Then she said, now I can't comb my hair. And then on February 2nd, something else happened. February 9th, something else happened. I mean, that would be a reasonable way to read that, wouldn't it? Well, the Ninth Circuit held in FTC v. Publishing Clearinghouse that conclusory declarations without sufficient detail are insufficient to raise the material fact. Well, that's a different question. That doesn't have anything to do with the date. You're saying that her statements that she couldn't comb her hair or brush her hair, tie her shoes, whatever all those factual statements are, are conclusive, which is an issue. But another issue from the one Judge Silverman is asking you about, which is whether we can read the affidavit as providing, sufficiently providing the time at which the declarant to which she was referring. And I don't think that you can. You're moving on to the fact that the facts alleged are not sufficient to show a disability. Right. I don't think that you can. And in addition, that paragraph in her declaration is totally inconsistent with her medical records and doctor's notes for that same period. Substantial records were subpoenaed from Kaiser. That just means it's disputed. Well, no, because she admitted in her deposition that it is true that she could work 8 hours per day during the relevant time period, which is this 2-month period in 1999 from February to April, and that her only restrictions were typing 2 hours per day and writing 4 hours per day. And so I would submit that submitting a conclusory declaration that says it's some unidentified period. Someone with carpal tunnel syndrome who can't, a serious case, who can't do some of the things she described in taking care of herself doesn't mean she's unable to do any kind of work. During that period, wasn't she assigned to some office where she did a different kind of work than her normal work? Yes. She was assigned to light duty and she was still working 8 hours per day doing filing and other type office work that didn't require typing and handwriting pursuant to her doctor's restrictions. But the Toyota Motor case, the Supreme Court case, says that the standard for proving a disability must be interpreted strictly to create a demanding standard, and that the impairment must be permanent or long-term, and the impairment must severely restrict a major life activity when the question is concerning the person's ability to perform manual tasks, which is exactly what's at issue here. In fact, in Toyota Motor, the plaintiff, Williams, had carpal tunnel syndrome as well. And in that same case, the Supreme Court held that the plaintiff's evidence of avoiding sweeping and difficulty dressing, playing with the kids, driving long distance did not show manual task disability as a matter of law. And here, I think the evidence is far less specific on the caring for oneself. I would say it's much more specific. It's more like the evidence that the Toyota case said you would need. But let me ask you a different question, because this case seems to be somewhat different from any other case in one respect. On the beginning of February, she had the meeting where there was a review of her working ability. And in many ways, she was a good employee. Her major problem seemed to be that she didn't get her reports in on time for whatever reason. But she was improving. Her rate of getting reports in was getting better, and the report said they noted improvement. And they counseled her as to correcting this. And she would have had, say, three months or so in which to correct and improve her conditions or her performance. What happened was that she never got a chance to improve because of the carpal tunnel syndrome. And she was then assigned to some other function because she couldn't do what was necessary to improve. Where does that leave the legal issue, where someone is discharged who might have improved and would have been given a chance to improve, but for the physical ailment? Well, the requirement, there's a Federal regulation, 5 CFR 315.803, that applies to probationary employees. And during this time, Ms. Fernandez, it's undisputed, was on a one-year probationary period that ended in April of 1999. And that regulation provides that Federal employers must terminate employees who fail to prove that they can satisfactorily do their job during the probationary period. Here, Ms. Fernandez has to prove that she can do the job. It's a disability. That's a justification for discharging her. Well, what the employer did was they looked at the time when she was not disabled, which was a period of several months from August until February of 1999. And I said she had not established up to that time. She had been in this job for about five months, I guess. And she had not established, although she was getting better and was improving. And she was told for the first time that she really needed to improve, and they discussed how she could improve. Well, the area that she was improving in was areas of the quality of her work, such as legal analysis. No, areas of reducing the backlog. She was not improving in the area of decreasing the backlog. The backlog was ever-increasing throughout her employment, even though she was on a reduced interview schedule during the same period of time from September to January of 1999. In fact, Ms. Fernandez admitted in her own deposition that before she ever acquired any cases in ñ she only acquired about 12 cases in Portland, Oregon, and that she didn't know how many cases were in her backlog before that. Well, the undisputed evidence, then, is that there were at least 23. She says that she has made steady improvement in this area. In October, she completed a mix of interviews and final decisions of 55. In January, she completed 66. And you're supposed to complete 77, but that's not improving. Well, the performance evaluation also puts her on notice that her backlog is a very serious problem and that ñ I understand that, but I said she was improving. Originally, she was doing 55 a month, and then she got up to 66, and she was supposed to get to 77. That's not improving? Well, she was giving ñ over time, she was given an increasing number of cases to be handling, which was a goal for her is to get up to the number of expected cases that other asylum officers in the office were handling. So she was improving and taking on additional cases, but not in getting those cases out the door. It still remained that she regularly, as months went on, accumulated more and more of a backlog. Well, let's at least say that after that review, they decided not to fire her then because she was hopeless, but to see if she could improve. And they gave her methods, ways of how she could improve, shorten the interviews, get the work done faster. She was going to be given an opportunity to prove it. Well ñ Or not. You think they were going to fire her in February? Well, the problem still lies with this Federal regulation. In order to consistently apply that regulation, an employer is forced to look at what ñ whether the employee has established during their probationary period. So your answer, then, is, I assume, that if an employee is improving and you're going to normally wait until the end of the probationary period to see if she improves, and then she becomes disabled, that then the regulation requires you to fire her as a result of a disability. Yes. That's one point. And there is law that is undisputed that that regulation is entitled to substantial deference. And so I would suggest that the Court should follow that. In addition, there is no requirement whatsoever, whether it's a Federal employer or any other employer, for an employer to wait to see if an employee is going to improve before making a decision to terminate them. No, there isn't. But that was the plan, was to wait to see if she would improve. Well, they were hoping that she'd clear up her backlog. So the plan was to wait and see if she would improve. And then during that period, she had a disability, so she could not improve. But there's no evidence in the record as to that being the plan or how long they were going to wait to see if she did, in fact, clear up her backlog. And, you know, in retrospect, it's hard to predict what would have happened had she not came down with this hand condition. I didn't understand the accommodation issue here. She came in and said, because of my hand problems, I would like voice recognition software that other people in the office have. And I want other people to type up my reports. I can understand the problem with having other people typing up her reports. I don't understand why she was declined voice recognition software. That particular request was not a reasonable request for accommodation because it's undisputed, and she admitted in her deposition, that typing would still be required in order to use that program. She also contends in her deposition that she was completely unable to type during this period. I mean, I'm familiar with voice recognition software that people who can't use their arms have. It doesn't require any typing or minimal assistance from somebody else. So one thing to keep in mind is this was back in 1999, and the testimony that is undisputed in the record is that there were two visually impaired employees who had it. But they were still able to type. And I think even more importantly, the plaintiff here admits that she was unable to write an essential function that a voice-activated computer could not fix. She was still required to handwrite in her interviews, when she's interviewing people, notes about what these applicants are telling her and what her impressions are. And there's no way that a voice-activated computer could help her with that. And in addition, a voice-activated computer could not fix her established problems with untimeliness, because she's already established she can't, you know, do it just typing up, even though she says she can type about 80 words a minute. So the problem here is the voice-activated computer would not be an effective accommodation in order to be reasonable. The parties agree the case law is. It has to be effective. It has to enable her to do her job. Another question. She was hired originally as an asylum, not an asylum, as a interview. Pardon me. Yeah. And then she was promoted after several months. Is there some reason that instead of discharging her, that she wouldn't be returned to her, the duties she could have performed? Yes. It's undisputed that she never requested a transfer. But aside from that, unilaterally transferring her would have, again, required an extension of the probationary period, which would be a violation of that Federal regulation, which actually it's a different Federal regulation, excuse me. It's 5 CFR 315.802, which says the probationary period is one year and may not be extended. So that would have been a violation to allow her to transfer. In addition, there's no doctor's notes submitted suggesting that she should transfer. And she failed to identify any vacant job that she'd be able to do. And lastly, it's INS's practice that in order to uniformly enforce the Federal regulations concerning probationary periods, that it's going to follow those regulations and discharge the employee rather than looking to transfer, because it decides to transfer one person. It creates all kinds of problems down the road for enforcing that Federal regulation that it's required to follow. So with respect to the failure to accommodate claim, INS only has to establish that it provided a reasonable accommodation. And here it's undisputed that it provided light duty, which the courts have held is a reasonable accommodation. And there's two cases I've cited, Keyes and King, that stand for that point. And secondly, it also got an ergonomics specialist to evaluate her workstation, made ergonomic changes to her workstation, including providing her with an ergonomic keyboard, ergonomic chair, and an ergonomic mouse tray. So the light duty you provided was the files. Was she able to do that light duty? Yes. She continued to work eight hours a day doing the light duty work, which under the law is a reasonable accommodation. So that satisfies. And then you fired her. She was doing it. You accommodated her by giving her light work. She did it, and you fired her? Well, that goes to the separate disparate treatment claim. The discharge is the adverse employment action alleged in the disparate treatment claim. With respect to the failure to accommodate claim, which is a separate question, it's during her employment was the INS making reasonable efforts to accommodate  her, and by providing light duty and making these ergonomic changes, the answer is yes, it in fact was. It was an accommodation that led to her discharge. Well, the accommodation didn't lead to her discharge. The discharge is relevant to the disparate treatment discrimination claim. And the reasonable accommodation claim is during her employment was the INS making reasonable efforts to accommodate, which it was given that it gave her light duty and made all these ergonomic changes to her work. In what sense was it light duty? She didn't have to do as many interviews as other people or what? No. Actually, she wasn't doing any interviews, because all of the interviews require handwriting, and afterwards require typing up the assessments. So handwriting and typing are very, very large portions. What did she do? What did she do when she was unemployed? She was given work, my understanding is filing different documents and office-type work in the hope that her carpal tunnel syndrome would improve enough that she would be able to. She was taken off of the interview. Correct. Other asylum officers were assigned all of her cases. I think the easiest way, in my view, for this Court to affirm the district court's decision is the element that she has to establish she was qualified to perform the essential functions of her asylum officer job with or without reasonable accommodation. And just looking at her deposition testimony and the admissions in her opposition, it's very clear that she could not do the essential functions of her job, which are completing her cases in a timely manner, typing, and writing. She admits in her deposition that she cannot type or write during this two-month relevant period, which is excerpts of record 51, 54, and 97. And in her opposition, her pleading concedes that she could not do the essential functions of her job, typing and writing. And that's supplemental excerpt of record 3. And to me, that is the easiest way to affirm the district court's decision because the plaintiff, under the Kennedy case, which is a Ninth Circuit case that I cite, she has the burden to establish this element. And she has completely failed to do that, to show that she could perform the essential functions of her asylum officer job, which it's undisputed required these three things. Okay. Thank you. Ginsburg. With respect to the question that you got after me about, one of the problems I had is that the judge struck from consideration paragraph 12 of the plaintiff's declaration. No. Could you speak up, sir? I'm having a hard time hearing you. No, I did not. Well, what she did is, in the record counting, you can see if I'm wrong or not, but I believe that the judge did strike paragraph 12. And paragraph 12. Oh, I'm sorry. You're right. She did. Paragraph 12 of the plaintiff's declaration, found at page 508 of the excerpts of records, began on Monday, February 1. Yeah, I mean, I know what the paragraph says. It still, it still, I mean, it just shows sort of the obvious that she was in pain. I mean, of course she was. And then the next paragraph, paragraph 13 that we've discussed already. Yes. And it seems that under summary judgment rules that you read the declaration in a reasonable way to favor the plaintiff, and you would read it as a narrative setting forth where her complaint was. Well, I'll tell you what. You know, if in fact it had been true under penalty of perjury that these things that are listed in paragraph 13 occurred between February 1st and February 2nd, like the preceding and following paragraphs, it could have just said, on February 1st. It could have, Your Honor, but is there any reason not to give it a reasonable ruling to show that this happened in the beginning of February, because when you read the next paragraph, it seems to be a continuation of the same subject matter. But even if on February 1st, these all of a sudden said, and I can understand how this could happen with carpal tunneling. You say, okay, I can't brush my hair, I can't brush my teeth. But that's not to say that the next day or at any time between February 2nd and April 28th, it didn't change. Because the only permanent diagnosis, and as Toyota makes clear, it has to be a permanent impairment. And the only evidence of a permanent impairment came two years later. So this could have been transient. It could have been an instantaneous thing. It could have lasted for a day or two days. It's obvious that it didn't persist for the whole period that she still was employed. Now, if the reasonable, a reasonable inference to draw from the evidence that it happened two years later that she was diagnosed, why isn't it reasonable to infer that from its onset in February 1st until two years later, she had the condition? That's nothing unreasonable about that. And one other thing, Your Honor, I'd like to emphasize, and I think that Judge Reinhardt saw this point, and it was looking at the excerpts of Record 156, which is the employee's performance review. And at page 156, and this is the performance review in February 11th to 12th, it says, however, it is noted that Officer Fernandez has about 30 cases that she has not completed for various reasons. This is a very serious problem. She needs to work to clear up this backlog as soon as possible. So the problem was to clear up the backlog. And that's where her condition or disability came into play. The discussion with respect to the essential functions of a job best found in Exhibit G, which is in the record, which is the job description. And the job description lists eight elements which are the essential functions of the job. And the essential functions of the job are not typing. There are clerk typists within the agency who type. What about the necessity of taking notes during interviews? Well, Your Honor, notes can be taken by dictaphone, not necessarily by handwriting. We have people who are sight impaired who take notes. Apparently, they're not writing, they may be writing in Braille. They do it by some other means, so could this person here, so could the plaintiff in this case. Thank you, counsel. Case just argued will be submitted. The court will stand in recess for the day. All rise.
judges: Reinhardt, Rymer, Silverman